# In the United States Court of Federal Claims

Nos. 19-1596, 19-1942
Filed: September 5, 2023

| | |
|---|---|
| BASIL AGAPION, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| THE UNITED STATES, | ) |
| | ) |
| Defendant. | ) |
| | ) |
| CHAPMAN/SPRING GARDEN, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| THE UNITED STATES, | ) |
| | ) |
| Defendant. | ) |

*Lindsay S.C. Brinton*, Lewis Rice LLC, St. Louis, MO, for plaintiffs.

*Peter W. Brocker*, U.S. Department of Justice, Washington, D.C., for defendant.

**OPINION AND ORDER**

*SMITH,* **Senior Judge**

These Fifth Amendment takings cases come before the Court following a damages trial to determine just compensation owed to eight landowners.[1]  The parties have stipulated to the landowners' fee ownership of the encumbered property.  *See* Joint Title Stipulations, *Agapion v. United States*, No. 19-1596, ECF No. 20; Joint Title Stipulations, *Chapman Spring/Garden v. United States*, No. 19-1942, ECF No. 11.  Defendant does not dispute liability.  *See* Defendant's Post-Trial Brief at 1, *Agapion*, ECF No. 151 [hereinafter Def.'s Post-Trial Br.]; Def.'s Post-Trial Br. at 1, *Chapman Spring/Garden*, ECF No. 117.  The question before the Court is determining just compensation.  *See id.*; Plaintiffs' Post-Trial Brief at 1, *Agapion*, ECF No. 144 [hereinafter Pls.' Post-Trial Br.]; Pls.' Post-Trial Br. at 1, *Chapman Spring/Garden*, ECF No. 110.  These

---

[1]      This combined trial opinion addresses eight of twelve unresolved claims in *Agapion v. United States*, No. 19-1596, and *Chapman/Spring Garden, LLC v. United States*, No. 19-1942.

plaintiffs collectively seek $7,357,492.00 in damages, plus interest.  Pls.' Post-Trial Br. at 85.
For the reasons that follow, the Court adopts the valuation findings of plaintiffs' expert, with
some modifications, as the just compensation owed to these plaintiffs.

## I.      Background

### A.      Rail-Banking Program

At the center of so-called "Rails-to-Trails" takings cases is the federal government's rail
banking program under Section 8(d) of the National Trails System Act ("Trails Act"), Pub. L.
No. 90-543 § 8(d), 82 Stat. 919, 925 (codified as amended at 16 U.S.C. § 1247(d)).  The purpose
of rail banking is to preserve historic railroad corridors for potential reactivation following a
railroad's decision to abandon the rail line.  *See Preseault v. I.C.C.*, 494 U.S. 1, 5–6 (1990)
*(Preseault I)*.  In the interim, these corridors are converted into recreational trails.  *Id.; see also*
49 C.F.R. § 1152.29(a)(2)–(3).

The process for transferring control of the rail corridor under Section 8(d) is important to
a takings analysis.  A railroad must notify the federal Surface Transportation Board ("STB")
when it intends to abandon a rail line.  *See* 49 U.S.C. § 10903(a); *see also* 49 C.F.R. §§ 1152.20–
1152.22.  When the railroad notifies the STB of its intent to abandon, a qualified "trail sponsor"
(usually a county, city, or non-profit organization) may notify the STB of its interest in managing
the rail-line right-of-way for recreational purposes pursuant to the rail-banking program.  *See* 49
C.F.R. § 1152.29(a).  If the railroad agrees to negotiate transfer of the right-of-way with the
prospective trail sponsor, the STB then issues a Notice of Interim Trail Use ("NITU").  *Id.*
§ 1152.29(d)(1).  After the STB issues the NITU, the railroad and the trail sponsor consummate
the transaction according to the terms of the negotiated sale and trail-use agreement, which
defines the transfer and future operation of the rail corridor for recreational purposes and
potential reactivation.  *Id.; see, e.g., Hardy v. United States*, 965 F.3d 1338, 1342 (Fed. Cir.
2020).  Once completed, this process creates a new easement that lasts in perpetuity, or until the
trail is no longer used for recreation or rail-line reactivation.  *Caldwell v. United States*, 391 F.3d
1226, 1229 (Fed. Cir. 2004); *Preseault v. United States*, 100 F.3d 1525, 1550 (Fed. Cir. 1996)
(en banc) *(Preseault II)*.

The federal government's takings liability for rail-banking transfers under Section 8(d) is
well established.  *See Caquelin v. United States*, 959 F.3d 1360, 1364 (2020) (citing *Preseault I*,
494 U.S. at 11–17).  If an adjacent landowner owns the property underlying the right-of-way in
fee simple, the federal government is liable for a taking when it prevents the property owner from
asserting its state-law rights (i.e., taking exclusive possession of the property) once the
railroad abandons the easement.  *Ladd v. United States*, 630 F.3d 1015, 1020 (Fed. Cir. 2010)
(explaining that the Surface Transportation Board's "issuance of the NITU is the . . . government
action in the railbanking process that operates to . . . preclude the vesting of state law
reversionary interests in the right-of-way," thus denying the landowners possession of their
property unencumbered by the easement).

The original easement granted to the railroad is often for "railroad purposes only" and
does not allow the creation and maintenance of a recreational trail.  *E.g., Preseault II*, 100 F.3d
at 1543–44 (describing the easement at issue as limited to railroad purposes).  If limited to

"railroad purposes," the original easement ceases to exist once the railroad abandons the line, at which time the landowner takes exclusive possession of its fee simple property. *See Preseault I*, 494 U.S. at 8. But under Section 8(d)'s rail-banking program, federal law prevents extinguishment of the railroad easement when the STB issues the NITU, thus depriving the landowner of their property rights under state law. *See Caquelin*, 959 F.3d at 1364 (citing *Preseault II*, 100 F.3d 1225). This is a taking for which the Fifth Amendment requires "just compensation." *Id.*

## B.   Findings of Fact[2]

At issue here is a 3.1 mile stretch of railroad corridor formerly operated by Norfolk Southern Railway Company ("Norfolk Southern") between Milepost CF-65.6 and Milepost CF-68.7, near downtown Greensboro, North Carolina. Plaintiffs' Exhibit 69 at 2 [hereinafter PX]. Norfolk Southern operated this stretch of rail line pursuant to an easement for "railroad purposes" only. Joint Title Stipulations at 1, ECF No. 20.

In April of 2019, Norfolk Southern and the City of Greensboro ("City") entered into a sale agreement to transfer the railroad's interest in the easement to the City as a trail sponsor pursuant to Section 8(d) of the Trails Act. PX69. The easement described in the sale agreement is, with some exceptions, 200 feet wide, extending 100 feet from each side of the centerline. PX19, Exhibit B [hereinafter Ex.]; PX90–98.[3] On October 11, 2019, the STB issued a NITU to facilitate the transfer of the easement. *See* Norfolk Southern Railway Company—Abandonment Exemption—in the City of Greensboro, N.C., 2019 WL 5099688 (S.T.B.) (Oct. 11, 2019). On November 8, 2019, Norfolk Southern transferred ownership of the easement to the City through a non-warranty deed for the purchase price of $8,500,000.00. *Id.* at 2; PX19; PX69.

The City acquired the Norfolk Southern easement to construct the "Downtown Greenway Project," an addition to a system of city-owned recreational trails winding through downtown Greensboro. *See* PX69; Transcript 226: 22–25 [hereinafter Tr.]; Tr. 227: 1–2; 562: 11; Tr. 563: 17. The City's plan for the proposed Greenway Project is to construct a twelve-foot-wide paved path that runs through the newly acquired easement. Tr. 231: 9–24; Defendant's Exhibit 28 [hereinafter DX]. At trial, a City representative testified that the City does not intend to use the entire width of the corridor for construction and operation of the recreational trail. Tr. 228: 4–9; Tr. 242: 6–14. Instead, the City's current plan for the Greenway Project is to use a small portion of the easement for the paved trail, thus allowing adjacent landowners to maintain existing structures that encroach on the easement. Tr. 231: 9–24; DX28.

These eight plaintiffs each owned property abutting and underlying portions of the 3.1 mile stretch of rail line at the time of the taking in 2019. *See* Joint Title Stipulations at 1–2;

---

[2]   This statement of the facts constitutes the Court's principal findings of fact under Rule 52(a) of the Rules of the Court of Federal Claims ("RCFC"). Other findings of fact and rulings on mixed questions of fact and law are set forth in the Discussion section of this opinion.

[3]   The easement narrows in some sections along the 3.1-mile corridor to less than 200 feet, including where it crosses the Burger Property, the LaRose Property, the Lane Property, and the Historic Wafco Condominiums Property. Plaintiffs' Exhibit 91 [hereinafter PX]; PX93; PX95; PX96. Plaintiffs' appraiser accounted for these deviations. PX1; PX4; PX7; PX5.

PX90.  The easement acquired by the City through the non-warranty deed runs through portions of the fee property owned by each landowner.  PX90–98.  The properties are a combination of residential, mixed use multi-tenant, condominium, office, and light industrial.  *See* PX1–8.

**Burger Property**.  The Burger Family Property is located at 2324 Battleground Ave, Greensboro, North Carolina, and is classified by the appraisers as "light industrial."  PX1 at 6; PX91.  The total parcel size is 83,766 square feet ("SF"), with a 30,460 SF light-industrial building located on the property.  PX1 at 6.  The highest and best use of this property before the acquisition is "light industrial."  PX1 at 6.  The highest and best use after the acquisition is "redevelopment/office."  PX1.  Pursuant to the survey attached to the non-warranty deed, the "easement being acquired is roughly 110 feet wide and transects the full width of the property from northeast to southwest, about 350 feet, for a total acquisition of 41,105 square feet," and about "50 feet of this is 'within the building footprint, spanning the back of the showroom, the office, the shop, and the back warehouse.'"  PX1 at 23.

**Michelle Agapion Morgan Property**.  The Michelle Agapion Morgan property is located at 410 S. Spring Street, Greensboro, North Carolina, and is classified by the appraisers as "residential."  PX2 at 6; PX97.  The total size of the parcel is 25,700 SF and contains three one-story brick buildings with a total of ten one-bedroom apartments.  PX2 at 6.  The highest and best use before the acquisition is residential use with up to thirteen units.  PX2 at 6.  The highest and best use after the property is continued residential use, but with four units.  PX2 at 6.  Pursuant to the survey attached to the non-warranty deed, the easement being acquired is "100 feet in depth and totals 23,406 Square feet," and approximately 230 linear feet of the easement transects the property.  PX2 at 20.

**Chaney-Frye 4 Property.**  The Chaney-Frye 4, LLC property is located at 504 Guilford Avenue, Greensboro, North Carolina, and is classified as an "office" building.  PX3 at 6; PX94.  The total size of the parcel is 31,363 SF and contains two office buildings: one is 3,277 SF and the other is 2,750 SF.  PX3 at 6.  The highest and best use of the property before and after the acquisition is "continued use as multi-tenant office/retail."  PX3 at 6.  Pursuant to the survey attached to the non-warranty deed, the easement is "100 feet in depth and runs the full length of the property, 220 feet, for a total acquisition of 22,000 SF."  PX3 at 21.  The easement "bisect[s] the larger of the two buildings and about half of the parking lot."  PX3 at 21.

**LaRose Property**.  The LaRose Properties, Inc. property is located at 517 Prescott Street, Greensboro, North Carolina, and is classified by the appraisers as "mixed use multi-tenant (improved)."  PX4 at 6; PX93.  The total size of the parcel is 35,284 SF and contains two buildings: a 1,715 SF church and a 4,263 SF office/retail building.  PX4 at 6.  The highest and best use of the property before and after the acquisition is "multi-tenant office/retail."  PX4 at 6.  Pursuant to the survey attached to the non-warranty deed, the "easement being acquired is 100 feet in depth [and] runs the full length of the back side of the property, 114 feet, for a total acquisition of 11,316 square feet" and "transect[s] the rear building."  PX4 at 22.

**Historic Wafco Condominium Association Property.**  The Wafco Condominium Association property is located at 801 Open West McGee Street, Greensboro, North Carolina, and is classified by the appraisers as "residential condominiums."  PX5 at 6; PX96.  The total size of the parcel is 19,776 SF and contains 28 residential condominiums.  PX5 at 6.  The highest

- 4 -

and best use of the property before the acquisition is for its current use of condominiums. PX5 at 6. The highest and best use after the acquisition is "vacant, for potential development." PX5 at 6. Pursuant to the survey attached to the non-warranty deed, the "easement being acquired is roughly 60 to 100 feet in depth and transects the full length of the property, 170 feet, roughly from north to south, for a total acquisition of 13,947 square feet." PX5 at 23. The easement would "take most of the building itself, and render the remainder both physically and economically infeasible for further use." PX5 at 23.

**Chapman/Spring Garden LLC Property.** The Chapman/Spring Garden LLC property is located at 500 Spring Garden Street, Greensboro, North Carolina, and is classified by the appraisers as an office building. PX6 at 6; PX98. The total size of the parcel is 24,089 SF and contains a 7,231 SF office building. PX6 at 6. The highest and best use before the acquisition is its current use as an office building. PX 6 at 6. The highest and best use after the acquisition is a "vacant development site." PX6 at 6. Pursuant to the survey attached to the non-warranty deed, the "easement being acquired is 100 feet in depth and totals 16,419 square feet." PX6 at 21. The length of the easement "transects the property at about 135 feet." PX6 at 21.

**Lane Property.** The Lane property is located at 814 West Market Street, Greensboro, North Carolina, and is classified by the appraisers as "light industrial." PX7 at 6; PX95. The total size of the parcel is 54,600 SF and contains a 24,551 SF light-industrial building. PX7 at 6. The highest and best use of the property before and after the acquisition is continued use as an industrial building. PX7 at 6. Pursuant to the survey attached to the non-warranty deed, the "easement being acquired is 65 feet wide and transects the full length of the property north-to-south, about 308 feet, roughly from north to south, for a total acquisition of 20,020 square feet." PX7 at 23. The easement crosses "the entire metal ancillary building" located on the property. PX7 at 23.

**Hayes Property.** The Harold and Thomas G. Hayes property is located at 1434 Whilden Place, Greensboro, North Carolina, and is classified by the appraisers as a condominium. PX8 at 6; PX92. The highest and best use of the property before and after the acquisition is continued use as a residential condominium. PX8 at 6. Pursuant to the survey attached to the non-warranty deed, the "easement being acquired is 100 feet wide and transects the full width of the property to the rear for a distance of about 26 feet for a total acquisition of 2,600 square feet." PX8 at 21.

## C.     Procedural History

Plaintiffs filed their respective complaints with this Court on October 15, 2019 and December 23, 2019. Complaint, *Agapion v. United States*, No. 19-1596, ECF No. 1; Complaint, *Chapman Spring/Garden v. United States*, No. 19-1942, ECF No. 1. Plaintiffs amended their complaints on January 9, 2020; April 30, 2020; and July 22, 2020. Amended Complaint, *Agapion*, ECF No. 11; Second Amended Complaint, *Agapion*, ECF No. 21; Amended Complaint, *Chapman/Spring Garden*, ECF No. 7. On July 20, 2020, the parties stipulated to the plaintiffs' fee title to the properties. Joint Title Stipulations, *Agapion* ECF No. 20; Joint Title Stipulations, *Chapman* ECF No. 11. At the parties' request, the Court stayed the cases to allow time for the parties to conduct settlement negotiations. *See* Order Staying Case *Agapion*, ECF No. 19; Order Staying Case, *Chapman/Spring Garden*, ECF No. 16. Having failed to settle the

eight claims at issue here, the parties requested a trial setting to establish the just compensation owed to these eight landowners. *Agapion*, ECF. No 49; *Chapman/Spring Garden*, ECF No. 31.

The Court held a valuation trial in Greensboro, North Carolina from March 16 to March 18, 2022, during which the Court conducted a site inspection of the eight properties. On May 11, 2022, plaintiffs filed their Post-Trial Brief and Motion for Partial Summary Judgment as to the Applicable Interest Rate. Pls.' Post-Trial Br., *Agapion*, ECF No. 144; Pls.' Post-Trial Br., *Chapman*, ECF. No. 110; Plaintiffs' Motion for Partial Summary Judgment, *Agapion*, ECF No. 145; Plaintiffs' Motion for Partial Summary Judgment, *Chapman*, ECF No. 111. On June 17, 2022, defendant filed its Post-Trial Brief and response to Plaintiffs' Motion for Partial Summary Judgment. Def.'s Post-Trial Br., *Agapion*, ECF No. 151; Def.'s Post-Trial Br., *Chapman*, 117. On July 5, 2022, plaintiffs filed their Reply in support of their Post-Trial Brief and Motion for Partial Summary Judgment. Plaintiffs' Post-Trial Reply Br., *Agapion*, ECF No. 152 [hereinafter Pls.' Post-Trial Reply Br.]; Pls.' Post-Trial Reply Br., *Chapman*, ECF No. 118. On July 21, 2022, the Court held closing arguments.

## II.    Overview of Trial Testimony

The three-day valuation trial in Greensboro, North Carolina consisted of testimony from eight witnesses.

Plaintiffs presented testimony from the following five witnesses:

- *Mr. Richard Lane*, a landowner plaintiff;
- *Mr. Philip Burger*, a landowner plaintiff;
- *Ms. Cynthia Ramos Straup*, managing director of Straup Solutions, a geospatial information systems (GIS) mapping company;
- *Mr. Christian Wilson*, Deputy City Manager for the City of Greensboro;
- *Dr. John Kilpatrick*, an expert appraiser.

Defendant presented testimony from the following three witnesses:

- *Mr. Brian Crean*, landowner plaintiff and president of the Historic Wafco Condominium Association;
- *Mr. Thomas Hayes*, a landowner plaintiff;
- *Mr. Thomas LaRose*, a landowner plaintiff.

Both parties presented testimony from landowner plaintiffs to discuss their interactions with the City of Greensboro before, during, and after the City's acquisition of the Norfolk Southern easement in November 2019. *See* Pls.' Post-Trial Br. at 3–8, 45–47; Tr. 559: 21–25, 560: 1–17; Tr. 576: 5–18; Tr. 620–21; Tr. 624: 6–9; Tr. 664: 14–25; Tr. 665: 1. This testimony included the landowners' knowledge of the City's plans for the Greenway, and any discussions between the City and the landowners regarding possible disruption to the landowners' present use of the portions of their property that encroach onto the easement. Pls.' Post Trial Br. at 3–8. Each of these landowners testified that they have not received any assurances from the City that they will be allowed to maintain any encroachments within the corridor, nor have they received

notice from the City about removing encroaching structures.  Tr. 139: 1–6; Tr. 164: 21–25; Tr. 165: 1; Tr. 166: 3–10; Tr. 559: 21–25; Tr. 560: 1–17; Tr. 620–21; Tr. 624: 6–9.

Plaintiffs also offered the testimony of Chris Wilson, the Deputy City Manager for the City of Greensboro.  Tr. 217: 21–23; Tr. 218: 1–25.  Mr. Wilson testified that he reviewed the purchase agreement between the City and Norfolk Southern in 2019, and that he believed the "exact area of the land to be purchased is to be determined by a survey."  Tr. 219: 23–25; Tr. 220: 1–5.  Mr. Wilson also testified that he believed none of the encroaching structures along the easement would affect the City's current plans for the Greenway, but that they might be removed in the future if they do interfere with the trail.  Tr. 228: 4–9; Tr. 242: 6–14.  Mr. Wilson testified that the City has not provided the plaintiffs with any legally binding assurances regarding their ability to continue using the corridor.  Tr. 243: 8–25; Tr. 244: 1–2; Tr. 244: 3–25; Tr. 245: 1–2.

Plaintiffs presented fact testimony from Ms. Cynthia Ramos Straup, managing director of the GIS-mapping company Straup Solutions.  Tr. 40–41.  Ms. Straup testified to a series of GIS maps created by her firm that purport to display the geographic dimensions of the easement obtained by the City of Greensboro from Norfolk Southern through the November 2019 non-warranty deed.  Tr. 41–42; Tr. 45–46; PX90–98.  Ms. Straup testified that the maps were based on the measurements contained in valuation charts filed with the county and in the survey attached to the non-warranty deed that transferred Norfolk Southern's ownership interest in the easement to the City.  Tr. 54: 4–24; Tr. 45: 3–23; PX33; PX90.  Ms. Straup testified that plaintiffs hired her firm to create the maps for valuation purposes.  Tr. 42: 19–24.  She also testified that defendant hired her firm to create similar maps in over twenty-five other valuation cases.  Tr. 42: 6–12.  Both Mr. Taylor's and Dr. Kilpatrick's findings, addressed below, were based on the easement described in the non-warranty deed reflected in the Straup maps.  PX1–8; PX71–79.

The testimony and reports of Dr. John Kilpatrick, plaintiffs' expert appraiser, was the only valuation evidence presented at trial.  *See generally* Tr. Vol. 2; Tr. Vol. 3.  Dr. Kilpatrick reviewed the reports of Mr. Thomas Taylor—an appraiser hired jointly by both parties for purposes of settlement negotiations—and testified to his review of these reports.  Tr. 269: 14–18; PX1–8; PX70–78.  Mr. Taylor appraised each of the eight properties using three well-established appraisal methodologies to determine "fair market value": (1) the "cost approach," (2) the "sales comparison approach," and (3) the "income capitalization approach."  *See* PX1–8; PX89; PX71–78.  Mr. Taylor then reconciled the differing results of the three approaches to reach a "fair market value."  PX71–78.  For each of the eight properties, Mr. Taylor concluded the landowner retained five percent of the property rights within the corridor.  PX71–78; Tr. 281: 4–11.

Dr. Kilpatrick generally agreed with Mr. Taylor's before and after-value calculations with some exceptions.  Dr. Kilpatrick found that Mr. Taylor failed to explain why plaintiffs retained five percent of their property rights within the easement corridor.  Tr. 281: 4–11.[4]  After reviewing the deposition of Greensboro Deputy City Manager Chris Wilson, Dr. Kilpatrick

---

[4]      Dr. Kilpatrick's reports note that he adjusted Mr. Taylor's valuations for two of the properties to account for inconsistences between the easement dimensions Mr. Taylor relied on and those contained in the non-warranty deed, as reflected in the Straup Maps.  *See* Plaintiffs' Post-Trial Brief at 29, 39 (discussing adjustments to Burger Property and Hayes Property) [hereinafter Pls.' Post-Trial Br.]; *see also* PX1 at 24.  Dr. Kilpatrick also reached a different after-value use determination for the Chapman/Spring Garden Property.  Pls.' Post-Trial Br. at 36–37.

concluded that plaintiffs did not retain any property rights within the burdened corridor and therefore the encumbered portion of the property—including any encroachments—contributed no economic value to the remainder property.  PX1–8; Tr. 278: 1–15.  Dr. Kilpatrick adjusted Mr. Taylor's after-value calculations to account for this total loss of rights within the corridor.  Tr. 281: 4–11.  Dr. Kilpatrick also testified that Mr. Taylor failed to include severance damages in his calculation to account for loss of privacy—a necessary component of the reduction in fair market value.  Tr. 282: 22–25.  To address this deficiency, Dr. Kilpatrick used the cost of constructing a privacy wall on each property as a "proxy" for severance damages.  Tr. 282: 22–25.  Dr. Kilpatrick valued the eight properties as follows:

| | Before Value | – | After Value | + | Severance | = | Just Compensation |
|---|---|---|---|---|---|---|---|
| 1. Burger Family | 1,357,000 | | 319,958 | | 181,198 | | 1,218,240 |
| 2. Hayes Family | 65,000 | | 23,213 | | 8,495 | | 50,282 |
| 3. LaRose Properties | 270,000 | | 119,888 | | 59,018 | | 209,130 |
| 4. Chaney-Frye 4 | 630,000 | | 249,500 | | 113,896 | | 494,396 |
| 5. Lane Family | 1,154,000 | | 605,984 | | 359,454 | | 907,470 |
| 6. Historic Wafco Condo. Ass'n | 3,377,000 | | 76,000 | | 88,010 | | 3,389,010 |
| 7. Michelle Agapion Morgan | 275,000 | | 90,000 | | 119,073 | | 304,073 |
| 8. Chapman Spring Garden | 780,000 | | 65,000 | | 69,891 | | 784,891 |
| Total for all 8 Properties | | | | | | | 7,357,492 |

Pls.' Post-Trial Br. at 28.

## III.    Discussion

The sole issue before the Court is determining the quantum of just compensation owed to these eight landowners.  *See* Pls.' Post-Trial Br. at 1 ("The sole dispute in this case is the amount of just compensation the government must pay these owners for taking their land."); Def.'s Post-Trial Br. at 1 ("[T]he single issue presented to this Court for adjudication [is] just compensation.").

### A.    Legal Standard for Just Compensation

The Fifth Amendment to the United States Constitution prohibits the federal government from taking private property for public use without paying the owner just compensation.  U.S. CONST. amend. V.  This Court has jurisdiction over takings claims against the United States, including those that occur pursuant to Section 8(d) of the Trails Act.  *See* 28 U.S.C § 1491; *Preseault I*, 494 U.S. at 11–17.  If the government is found liable for the taking, the Court must determine the just compensation owed to the plaintiff.  *See Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2071 (2021) ("When the government physically acquires private property for a public use, the Takings Clause imposes a clear and categorical obligation to provide the owner with just compensation.") (citation omitted); *see also Castillo v. United States*, 952 F.3d 1311,

1315 (Fed. Cir. 2020) ("[T]he government must provide just compensation to the owner of the reversionary rights eliminated by a Trails Act conversion.") (citation omitted).

The well-established benchmark for just compensation is the "fair market value" for the "highest and best use" of the property. *Olson v. United States*, 292 U.S. 246, 255 (1934); *see also Rasmuson v. United States*, 807 F.3d 1343, 1346, n.1 (Fed. Cir. 2015). This is generally measured by the "price at which the property would change hands between a willing buyer and a willing seller," both "reasonably informed as to all relevant facts." *Julius Goldman's Egg City v. United States*, 697 F.2d 1051, 1054 n.3 (Fed. Cir. 1983) (*Egg City II*) (quoting *Miller v. United States*, 620 F.2d 812 (Ct. Cl. 1980)). The constitutional import of just compensation—and the use of fair market value to establish it—is to ensure the owner of the condemned property is made whole, and no more. *See United States v. 564.54 Acres of Land*, 441 U.S. 506, 516 (1979).

If the taking is caused by the burden of an easement, fair market value is determined using the "before-and-after method" (the "Federal Rule"), which is "the difference between the value of the property before and after the Government's easement was imposed." *McCann Holdings, Ltd. v. United States*, 111 Fed. Cl. 608, 614 (2013) (quoting *Otay Mesa Property, L.P., v. United States*, 779 F.3d 1358, 1364 (Fed. Cir. 2012)). And when the taking is only partial—as is often the case with an easement—just compensation includes "compensable damages," which is the "diminution in value of the owner's remaining property resulting from the taking." *Childers v. United States*, 116 Fed. Cl. 486, 497 (2013) (citation omitted); *Uniform Appraisal Standards for Federal Land Acquisitions* § 1.7.1.1 (6th ed. 2016) [hereinafter "*Yellow Book*"]. The government may pay the cost to cure when it is less than the property's reduction in fair market value. *McCann Holdings, Ltd.*, 111 Fed. Cl. at 614, 622–23 (citation omitted). In other words, the cost to cure is usually an alternative to the reduction in value for determining just compensation. *See United States v. Miller*, 317 U.S. 369, 375–76 (1943).

The heart of just compensation is to remedy "actual damages" caused to the plaintiff by the taking. *Gadsden Industrial Park, LLC v. United States*, 956 F.3d 1362, 1371 (Fed. Cir. 2020) (quotation marks omitted). The plaintiff has the burden of proving that it is entitled to just compensation and must demonstrate its damages "with reasonable certainty." *Id.*; *see also Childers*, 116 Fed. Cl. at 497 (citing *Miller*, 620 F.2d 812). The Court will find that a plaintiff meets its burden when it presents market data supporting an estimated reduction in value to the injured property. *See McCann Holdings, Ltd.*, 111 Fed. Cl. at 614.

The Court is not limited to a prescribed methodology when determining fair market value and just compensation. *See Yaist v. United States*, 17 Cl. Ct. 246, 257 (1989). Rather, a proper formulation of just compensation requires the Court to "synthesize in its mind the record before it, determine to what extent opinion evidence rested on fact, consider and weigh it all, and come up with figures supported by all the evidence." *Washington Metro. Area Transit Auth. v. United States*, 54 Fed. Cl. 20, 36 (2002) (citation and alteration omitted). If "a plaintiff has not provided evidence sufficient to determine just compensation," the Court "is not obligated to fashion its own award." *Gadsden Indus. Park, LLC*, 956 F.3d at 1371.

### B.    Plaintiffs' Valuation Estimates

Plaintiffs collectively seek $7,357,492.00 in damages, plus interest.  Pls.' Post-Trial Br. at 85.  To support their valuation estimates, plaintiffs marshal testimony of their expert appraiser Dr. John Kilpatrick.  PX1–8; Tr. 351: 1-11.  Defendant did not present its own, independent valuation of the eight properties, nor did defendant offer rebuttal testimony from a valuation expert at trial.  Instead, defendant attacks the accuracy and credibility of plaintiffs' evidence and argues that plaintiffs fail to meet their burden of proof to justify Dr. Kilpatrick's findings.  Def.'s Post Trial Br. at 24–48.  Defendant argues plaintiffs should receive no compensation at all.  *See id.* at 2.

Defendant's case against Dr. Kilpatrick's findings is threefold: (1) his appraisal review was fundamentally flawed because it was based on an erroneous or unestablished understanding of the size and scope of the easement; (2) he failed to properly calculate compensable damages; and (3) his valuation of the eight properties is facially unreliable because his findings are inconsistent with post-NITU sales and, in some cases, exceed the unburdened value of the property.  Def.'s Post-Trial Br. at 9–49.[5]  For the reasons that follow, the Court finds Dr. Kilpatrick's before- and after-value findings reliable and are thus informative for determining just compensation.  The Court, however, finds his approach to calculating severance damages unsupported by the record.

#### 1.    Width and Exclusivity of the Easement

 Central to defendant's argument against compensation is that Dr. Kilpatrick's findings are based on an incorrect or unestablished size and scope of the easement.  Def.'s Post-Trial Br. at 9–16, 27–28.  Dr. Kilpatrick's calculations, defendant argues, do not accurately reflect the nature and extent of the property rights taken from plaintiffs and the Court should not rely on his conclusions when awarding just compensation.  *Id.* at 27–31.

##### i.    Width of the Easement

In defendant's view, Dr. Kilpatrick's valuation of plaintiffs' property is incorrect and unreliable because his calculations were based on incorrect measurements of the easement.

---

[5]    Defendant's attempts to exclude the Straup Maps (PX90–98) and the Taylor Appraisals (PX71–78) from the Court's consideration are unavailing.  Defendant's Post-Trial Brief at 10–11 [hereinafter Def.'s Post-Trial Br.].  Dr. Kilpatrick's review of the Taylor appraisals is consistent with the *Yellow Book* and provides an acceptable and admissible basis to conclude the value of the eight assessed properties.  *See Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 152, (1999)) ("[D]eterminations as to the qualification of experts and the admissibility of their testimony, including an evaluation of whether the opinion is reliable and relevant, are generally within the discretion of a trial judge, and are reviewed for an abuse of discretion, only overturned if manifestly erroneous.").  A review appraiser may incorporate "data and analysis . . . determined to be credible and in compliance with these Standards" into a review report by using an "extraordinary assumption," as defined by the *Yellow Book*.  *Yellow Book* § 3.5 (citing *Yellow Book* § 1.2.7.1 n.22 ("Extraordinary assumptions presume as fact otherwise uncertain information about physical, legal, or economic characteristics of the subject property; or about conditions external to the property, such as market conditions or trends; or about the integrity of data used in an analysis.")).  Additionally, the Court finds that the Straup Maps are an accurate representation of the easement dimensions contained in the valuation maps and conveyed by the November 2019 non-warranty deed, as Ms. Straup testified to at trial.  Transcript 54: 4–24 [hereinafter Tr.]; Tr. 45: 3–23.  The Court therefore considers the Straup maps *only* as reflecting the easement dimensions described in the valuation maps and non-warranty deed.  PX19, Exhibit B; PX33; PX90–98.

Specifically, defendant asserts that plaintiffs fail to establish that the survey attached to the non-warranty deed accurately reflects the true dimensions of the City's easement. Def.'s Post-Trial Br. at 9–16, 27–28. To support this argument, defendant proffers a collection of property records demonstrating that Norfolk Southern did not have the legal title to the easement width reflected in the survey along the full 3.1 miles of rail line, including where it burdens seven of these plaintiffs' property. *Id.* at 9–15; Joint Exhibit 45 [hereinafter JX]; JX46; PX33; JX29D; JX29G; JX29I; JX29J. Accordingly, the City did not obtain an easement as wide as the one outlined in the survey, because Norfolk Southern itself never owned such a property interest. Def.'s Post-Trial Br. at 9–16. Plaintiffs are thus not entitled to compensation for that which the City did not actually acquire. *Id*. at 13–14.

Plaintiffs believe "the size and dimensions of the rail corridor acquired by the City are defined by the survey attached to the Non-Warranty [Deed] between the railroad and the City, and all of the land located within the corridor is now owned by the City." Pls.' Post-Trial Reply Br. at 6. Plaintiffs also note that the "City is already acting as if it acquired the full 200-ft wide rail-trail easement." Pls.' Post-Trial Reply Br. at 11, n.4. Plaintiffs argue that because the survey attached to the non-warranty deed "defines the portions of Plaintiffs' property that are now encumbered by the City's new easement," the Court should view the survey as the controlling dimensions of the taking. *Id.* at 11.

In a valuation trial such as this, the Court's objective is to determine the just compensation owed after considering all the evidence presented. *Otay Mesa Property, L.P.*, 779 F.3d at 1321 (observing that the trial court must consider the "entire evidence" presented by the parties when making factual determinations). This requires the Court to consider the accuracy of any factual and legal underpinnings upon which plaintiffs rely to meet their burden of proof. *See Gadsden Indus. Park, LLC*, 956 F.3d at 1368 ("Whether a taking under the Fifth Amendment has occurred is a question of law with factual underpinnings.") (citation omitted). If plaintiffs' case rests on unfounded or inaccurate statements of law or fact, the Court should account for such errors and deficiencies when making its just compensation determination. *See Ultra-Precision Mfg. Ltd. v. Ford Motor Co.*, 338 F.3d 1353, 1359 (Fed. Cir. 2003). But if plaintiffs present credible market evidence combined with accurate factual and legal assertions to make their case, they have met their burden. *McCann Holdings, Ltd.*, 111 Fed. Cl. at 614, 622–26.

Plaintiffs make a persuasive showing that the survey attached to the non-warranty deed defines the geographic dimensions of the property interest acquired by the City. PX19, Ex. B. Easements created pursuant to Section 8(d) of the Trails Act are "new and different" from the original easement owned by the railroad. *Toews v. United States*, 376 F.3d 1371, 1376 (Fed. Cir. 2004). In this case, the "new and different" easement is the one created by the agreement between Norfolk Southern and the City pursuant to the October 2019 NITU, the dimensions of which are defined by the survey attached to the non-warranty deed. *See* PX19, Ex B. As demonstrated at trial, the City believes it owns the easement described in the survey, the City acts as if it owns this easement, and up until trial, the parties appeared to operate with that understanding. Tr. 219: 23–25; Tr. 220: 1–5; Tr. 223: 10–13; PX71–78.

Defendant fails to convince the Court that Norfolk Southern did not have legal title to the easement interest reflected in the survey attached to the non-warranty deed. Not until post-trial briefing did defendant fully raise this theory—that the easement purchased by the City is

- 11 -

different in size than the one described in the survey. *See* Def.'s Post-Trial Br. at 9–16. Indeed, defendant hired Mr. Taylor to appraise each of these eight properties based on the measurements described in this same survey. PX71–78; PX90–98; Tr. 530: 9–19. And during trial, defendant presented no expert witness to discuss the import and effect of its proffered collection of property records on the easement interest transferred from Norfolk Southern to the City through the non-warranty deed. *See Katzin v. United States*, 124 Fed. Cl. 122, 124 (2015) (holding that expert testimony addressing chain-of-title questions can provide a "useful factual explication of the historical context affecting the original grants and reservations of land and the scope of the resulting title and subsequent transfers surrounding the property at issue").

In view of all the evidence presented by the parties, the Court finds that plaintiffs have met their burden of proving that the survey attached to the non-warranty deed governs the dimensions of the new easement obtained by the City of Greensboro and thus reflects the taking of plaintiffs' property. *See Otay Mesa Property, L.P.*, 779 F.3d at 1364. Dr. Kilpatrick's valuation findings premised on the easement dimensions conveyed in the non-warranty deed are not unreliable in this respect and may be used to determine just compensation. *See* PX1–8.

### ii.    Exclusivity of the Easement

Defendant also argues that plaintiffs fail to demonstrate that the City's new easement is exclusive, and thus deprives plaintiffs of the full use of the burdened property. Def.'s Post-Trial Br. at 27–31. Defendant argues that Dr. Kilpatrick's findings rely on this incorrect understanding of the rights plaintiffs retain in the encumbered property. *Id.* In response, plaintiffs contend that Dr. Kilpatrick correctly concluded, for valuation purposes, that these landowners do not retain the legal right to use the encumbered property. Pls.' Post-Trial Reply Br. at 7–12. Plaintiffs argue the City of Greensboro has the exclusive authority to dictate the use of the entire corridor for maintaining the recreational trail and the STB retains the exclusive authority to dictate the use of the entire corridor for potential rail-line reactivation. *Id.* at 7–12. Consequently, plaintiffs assert that they have "lost all rights in the portion of their land within the rail-trail easement." *Id.* at 7.

Our Court often finds that a fee simple landowner effectively loses all property rights within the corridor of a Section 8(d) easement. *See, e.g., Jackson v. United States*, 155 Fed. Cl. 689, 702 (2021) (collecting cases). Through a Section 8(d) transfer, the trail sponsor obtains the authority to dictate how much of the corridor it needs to construct and operate the recreational trail, *see* 16 U.S.C. § 1247(d); *Caquelin*, 959 F.3d at 1367, and the federal government (vis-à-vis the STB) retains the authority to decide the use of the full corridor for purposes of reactivating the rail line, *see Caldwell*, 391 F.3d at 1229 (observing that "the STB retains jurisdiction for possible future railroad use" over rail-banking easements). The natural and intended consequence of this allocation of control is that the landowner retains no legal right to use the encumbered portion of the corridor in the face of a conflicting position taken by the City or the STB. *See Hardy*, 141 Fed. Cl. at 16–17 ("[P]laintiffs have no remaining use of the land burdened by the trail easement . . . .").

The Court sees no reason to conclude differently here. The taking for which plaintiffs are entitled to just compensation is the destruction of their property interest within the corridor, *see Caquelin*, 959 F.3d at 1367–68, and the attendant reduction in value to their land associated with

this loss of property interest, *see Otay Mesa*, 670 F.3d at 1364.  Here, the reversionary right plaintiffs lost is the unencumbered fee ownership of the property underlying the easement.  *See Preseault II*, 100 F.3d at 1552.  An essential characteristic of unencumbered fee ownership—which these plaintiffs no longer have—is the right to exclusive use of one's property.  *See Cedar Point Nursery*, 141 S. Ct. at 2072 ("The right to exclude is one of the most treasured rights of property ownership.") (quotation marks and citation omitted).  This right is necessary to maintain structures within the easement corridor in the face of a conflicting use.  *Caquelin*, 959 F.3d at 1367 (observing that Section 8(d) creates "a coerced easement that impairs the landowner's right to exclude by allowing others' occupation.").  The 2019 NITU destroyed that right.  *See Caldwell,* 391 F.3d at 1228 ("[S]tate law reversionary interests are effectively eliminated in connection with a conversion of a railroad right-of-way to trail use.") (citations omitted); *Dana R. Hodges Trust*, 111 Fed. Cl. At 457 (observing that "issuance of a NITU by the STB" eliminates "the landowners' reversionary rights.").

While the City or the STB might never order the removal of any encroaching structures within the right of way, they still have the authority to do so.  As the trail sponsor, the City of Greensboro has the exclusive authority to control all use within the corridor while it is used for a recreational trail.  *Illig v. United States*, 58 Fed. Cl. 619, 631 (2003); *Jackson*, 155 Fed. Cl. At 701.  This gives the City the inherent ability to determine what other uses of the easement conflicts with its own.  *See Norfolk Southern Ry. Co. v. Smith*, 169 N.C. App. 784, 789 (N.C. Ct. App. 2005) (finding that landowner's use of their property is "subject to the railroad's easement," and the railroad "may expand its use of the right-of-way, to the extent of its statutory right, for any legitimate purpose as determined by the railroad's sound business judgment."); *Illig*, 58 Fed. Cl. at 631 ("The clear implication [of Section 8(d)] is that defendant wished to maintain the status quo, securing for [trail sponsor] whatever rights [the railroad] previously held in the easement."); *see also Trevarton v. South Dakota*, 817 F.3d 1081, 1087 (8th Cir. 2016).  Likewise, the STB retains the exclusive authority over the corridor for rail-line reactivation, giving it the same ability to determine conflicting use as it relates to rail banking.  *See* 49 U.S.C. § 10501(b) (The STB's jurisdiction over rail line construction and maintenance is "exclusive"); *Caldwell,* 391 F.3d at 1230 ("[T]he STB retains jurisdiction for possible future railroad use."); *Preseault II,* 100 F.3d at 1552; *Dana R. Hodges Trust*, 111 Fed. Cl. at 457.  As a result, plaintiffs have no legal right to maintain an encroaching structure if either the STB or the City determine the encroachment conflicts with their use of the easement.  *See Caldwell,* 391 F.3d at 1229; *Illig*, 58 Fed. Cl. at 631.

Given plaintiffs' loss of guaranteed legal rights to maintain structures within the corridor, Dr. Kilpatrick was correct to appraise the property as such.  PX1–8; Tr. 278: 1-15.  When calculating diminution in value, appraisers should "assume that the condemnor will utilize the rights acquired to their fullest extent," and account for what the condemnor *can* do, not what it is *likely* to do.  J.D. Eaton, REAL ESTATE VALUATION IN LITIGATION 291 (Appraisal Institute eds., 2d ed. 1995) ("The property owner is entitled to consideration for the damage the condemnor has the power to inflict."); *see also Barclay v. United States*, 443 F.3d 1368, 1374 (2006) ("The [taking] is the NITU, not physical ouster from possession.").  Dr. Kilpatrick did just that by basing his valuation findings on the plaintiffs' complete loss of enforceable legal rights to use the property encumbered by the new easement.  PX1–8; Tr. 278: 1-15.  This is consistent with best appraisal practices and the Court's understanding of the Section 8(d) easement.

2. **Calculation of Compensable Damages**

Defendant also objects to Dr. Kilpatrick's method of calculating compensable damages. Def.'s Post-Trial Br. at 31–39.  Specifically, defendant believes that Dr. Kilpatrick used a flawed method for calculating severance damages; that he failed to base his severance damage calculations on market data as prescribed by the *Yellow Book*; and that he used an erroneous methodology for calculating the cost to cure, thus inflating the overall valuation findings.  *Id.* Given these methodological deficiencies, defendant argues the Court should disregard Dr. Kilpatrick's conclusion that just compensation owed to these eight plaintiffs includes the cost to build a privacy wall to "cure" damages to the remainder.  *Id.*

In response, plaintiffs argue that defendant merely offers a "lay-person's uninformed criticism of Dr. Kilpatrick's expert appraisal review techniques."  Pls.' Post-Trial Br. at 84.  In plaintiffs' view, "Dr. Kilpatrick explained, in-depth, how and why this is a proper appraisal practice," and the Court should therefore disregard defendant's criticism of his methodology. Pls.' Post-Trial Reply Br. at 18.

The Court agrees that Dr. Kilpatrick's inclusion of the privacy wall in his compensable-damages calculation is inconsistent with the Federal Rule methodology and overcompensates plaintiffs.  *See United States v. Reynolds*, 397 U.S. 14, 16 (1970) ("The owner is to be put in the same position monetarily as he would have occupied if his property had not been taken.").  The Federal Rule requires an appraiser to make two calculations: the value of the property before the easement, and the value of the property encumbered after the easement.  *See Rasmuson v. United States*, 807 F.3d 1343, 1345 (Fed. Cir. 2015); *Yellow Book* § 4.6.1.  The difference between the two is the reduced fair market value of the property, which typically reflects the just compensation owed to the property owner.  *See United States v. 33.92356 Acres of Land*, 585 F.3d at 9–10 & n.6 (1st Cir. 2009) (citing *United States v. Miller*, 317 U.S. 369, 375–76 (1943)). This calculation should factor in all damages to the property caused by the taking, including the loss of privacy and the ability to exclude the public.  *See Miller*, 317 U.S. at 375–76 (observing that "the owner's compensation for that taking includes any element of value arising out of the relation of the part taken to the entire tract."); *Yellow Book* § 4.6.1 ("[P]roper application of the before and after method will result in a figure that reflects the value of the land actually acquired as well as any compensable damages and direct and special benefits to the remainder property.").

Here, Dr. Kilpatrick deviated from standard practice of the Federal Rule methodology for calculating the reduction in fair market value.  *Compare* Tr. 368: 23–25; Tr. 369: 1-5; Tr. 266:7–13; Defendant's Demonstrative Exhibit 3 [hereinafter DDX] *with Miller*, 317 U.S. at 375–76; *Yellow Book* § 4.6.1.[6]  Instead of solely calculating the before-and-after difference in value, Dr. Kilpatrick conducted an additional calculation—the cost of building a privacy wall.  *See, e.g.*, Tr. 269: 4–6, 282: 21–25.  In his view, the addition of this cost would ostensibly "cure" the reduction in value attributable to the loss in privacy caused by the presence of the easement— what he refers to as "severance damages."  *See* Tr. 286.  Dr. Kilpatrick testified that further compensation is warranted because Mr. Taylor failed to consider these "severance damages" in his after-value calculations.  Tr. 292: 9–11; Tr. 300: 8–10; Tr. 311: 16–22; Tr. 318: 4–9; Tr. 326:

---

[6]      The Court notes that while only the government's appraisers are bound by the Yellow Book, *Hardy v. United States*, 141 Fed. Cl. 1, 32 (2018), the methodologies it prescribes "are consistent with appraisal industry standards," *Tech. Coll. of the Low Country v. United States*, 145 Fed. Cl. 408, 426 (2019).

23–25; Tr. 327: 1-5; Tr. 334: 14–25; Tr. 335: 1-5; Tr. 341: 11-25; Tr. 342:1-14; Tr. 348: 8–12; PX1–8. But instead of recalculating the after-value of the properties to account for damages caused by reduced privacy, Dr. Kilpatrick used the cost of a privacy wall as a "proxy" for this missing component to the reduction in value. Tr. 503:19–25; Tr. 504: 1–2. According to Dr. Kilpatrick, Mr. Taylor's findings would not accurately reflect the true reduction in value without this adjustment. PX1–8.

The Court is not convinced that incorporating this additional "cost-to-cure" accurately reflects the just compensation owed to these plaintiffs. *See Miller*, 317 U.S. at 375–76; *Hardy*, 131 Fed. Cl. at 14 (citing *Rasmuson*, 807 F.3d at 1345). Dr. Kilpatrick fails to adequately explain why Mr. Taylor's after-value calculations did not account for the reduction in value attributable to loss of privacy, as would be consistent with the normal Federal Rule methodology. Tr. 268–69; PX1–8. Consequently, Dr. Kilpatrick's cost-to-cure formula runs the risk of double compensating plaintiffs.

Under a proper cost-to-cure calculation, the privacy wall would serve as a proxy for the cost of remedying whatever negative impact the easement has on the property precipitating the reduction in value. *See Vaizburd v. United States*, 384 F.3d 1278, 1286–87 (Fed. Cir. 2004) (observing that the cost to cure is an "approach to valuation."); *Yellow Book* § 1.7.1.1. Using Dr. Kilpatrick's formulation, however, the dollar amount associated with the "cost to cure" would be *added to* the reduction in fair market value instead of being *substituted for* the reduction in fair market value. *See* DDX3. While these two approaches for calculating damages are acceptable when used independently of each other, Dr. Kilpatrick used them together without fully explaining why this combination was necessary for these eight properties. DDX3. Plaintiffs would not only receive compensation for the reduced value of their property, but they would also receive compensation for the cost of curing something for which they have already been made whole. *See Sears v. United States,* 132 Fed. Cl. 6, 22 (2017) (citing *Miller*, 317 U.S. at 376). Allowing such a windfall would conflict with the guiding principle of just compensation that the plaintiff should be "made whole but is not entitled to more." *United States, v. Va. Elec. & Power Co.*, 365 U.S. 624, 633 (1961) (citation omitted); *see also Almota Farmers Elevator & Warehouse Co. v. United States*, 409 U.S. 470, 473–74 (1973) ("The owner is to be put in the same position monetarily as he would have occupied if his property had not been taken.") (citation omitted).

Absent a compelling showing that Mr. Taylor's after-value findings did not already account for the full panoply of damages caused by the burden of the new easement, the Court does not believe this cost to cure reflects a component of just compensation owed to these plaintiffs. *Miller*, 317 U.S. at 375; *Yellow Book* § 4.6.1.

### 3.    Facial Unreliability

Finally, defendant argues Dr. Kilpatrick's appraisal review is facially unreliable because his valuations of these eight properties are inconsistent with sale prices of property in the Greensboro real-estate market following the 2019 NITU, including three of the properties at

issue in this case.  Def.'s Post-Trial Br. at 43–48. [7]  In defendant's view, the Court should disregard his calculations due to these inconsistencies with recorded market activity.  *Id.*

The Court is not convinced that Dr. Kilpatrick's valuation should be discarded in view of defendant's evidence of post-NITU sales because it is unclear whether these transactions are an accurate representation of fair market value for these plaintiffs' properties.  Def.'s Post-Trial Br. at 43–48.  A sale price only reflects fair market value when both parties to the transaction are reasonably informed of all relevant facts.  *Egg City II*, 697 F.2d at 1054 n.3 (citation omitted). Appraisers should presume the buyers engaging in arm's-length transactions in an "active market" are aware of general land-use regulations and other legal restrictions.  *Fla. Rock Indus. v. United States*, 18 F.3d 1560, 1566 (Fed. Cir. 1994) (*Florida Rock III*).  But that presumption does not prevent the Court from concluding that the market is not fully informed of such restrictions after considering the facts of a particular case.  *See Childers,* 116 Fed. Cl. at 497 ("Just compensation should be carefully tailored to the circumstances of the case . . . .").  If the Court finds the presumption unwarranted in light of evidence presented at trial, the Court should tailor its just compensation findings accordingly.  *See Otay Mesa Prop., L.P.,* 670 F.3d at 1369 ("[T]he Court of Federal Claims [has] discretion in identifying a methodology that fulfills the goal of awarding [a plaintiff] just compensation.").

The City's control over the easement is relevant in determining the value of these eight properties.  *See Yellow Book* § 4.6.5.1 (discussing the relevance of understanding dominant easement interests when determining fair market value).  Dr. Kilpatrick testified at trial that, in his expert opinion, "it's very questionable" whether a sale reflects fair market value if the buyer is unaware of the City's full authority over the easement.  Tr. 336: 20–23.  Dr. Kilpatrick also testified that it is unclear whether any of the buyers in these transactions were aware that the City could order removal of the portions of structures encroaching on the easement.  Tr. 299:3-17; Tr. 336: 6-25; Tr. 337:1-7.  As Mr. Wilson and the landowner plaintiffs testified at trial, the City has not specifically discussed its transaction with any of these landowners abutting the easement, nor provided assurances regarding future use of the encumbrance.  *See supra* § I.B.  Therefore, the Court is not convinced that any of the parties to these transactions were aware of the extent to which the City could regulate the use of property within the corridor.  *Id.*; *Egg II*, 697 F.2d at 1054 n.3.

Considering the body of evidence, including Dr. Kilpatrick's expert opinion, the Court finds no basis to presume the post-NITU market in Greensboro was adequately informed of the City's full authority to control use and order removal of structures within the easement.[8]  *See Florida Rock III*, 18 F.3d at 1567 (holding that a court "may not substitute its own judgment as

---

[7]   The Court agrees that Dr. Kilpatrick has failed to justify why any of these plaintiffs are entitled to more than the before-value of their property.  Def.'s Post-Trial Br. at 40–43.  However, after excluding the cost of the privacy wall from Dr. Kilpatrick's compensable-damages calculation, none of the plaintiffs would receive more compensation than the before value of their property.  *See infra* § III.c.2.

[8]   The Court is also skeptical that post-NITU sales of property not abutting or encroaching the easement are reflective of the fair market value of plaintiffs' property.  Def.'s Post-Trial Br. at 45.  Absent expert testimony to the contrary, the Court views such properties as an incomplete reflection of the reduction in value attributable to the encumbrance on plaintiffs' property.

to what is a wise investment" when "the market provides a *well-substantiated* value for a property.") (emphasis added); *Yellow Book* § 4.4.2.4.7 ("Sales that occurred after the date of valuation *may* be considered if they are *not otherwise incompetent* as evidence of value.") (emphasis added). Absent testimony explaining why these post-NITU sales reflect the fair market value of plaintiffs' property, the Court is loath to disregard the reasoned explanation of plaintiffs' appraisal expert. *Abruzzo v. United States*, 21 Cl. Ct. 351, 355 (1990) (rebuttal expert testimony makes "the fact-finder's task more manageable by an orderly presentation of complex fact issues."). Thus, Dr. Kilpatrick's decision not to include the post-NITU sales when determining the after value does not render his findings unreliable. Tr. 299: 3–17; Tr. 336: 6–25; Tr. 337: 1-7.

      **C.**    **The Court's Just-Compensation Findings**

      After considering the totally of the record, including the factual and opinion evidence contained therein, the Court concludes the following:

          **1.**    **Taking**

      Market data and the factual evidence in the record adequately support Dr. Kilpatrick's before- and after-value findings. Thus, his calculations reflect a reasonable estimate of the reduced value for each of the eight properties. PX1–8; *McCann Holdings, Ltd.*, 111 Fed. Cl. at 614; *Washington Metro. Area Transit Auth.*, 54 Fed. Cl. at 36. Dr. Kilpatrick's review of Mr. Taylor's appraisal—and his modifications of Mr. Taylor's findings, including those to account for total loss of property rights within the corridor—were well-reasoned and consistent with best appraisal practices and the Court's view of the easement at issue. *See* PX1–8; *Yellow Book* § 3.5 (The review appraiser need not "replicate the steps completed by the original appraiser."). As stated above, however, Dr. Kilpatrick's inclusion of the cost to construct a privacy wall into the compensable damages total for each property is not supported by the evidence. *See supra* § III.B.2. Accordingly, the Court adopts the difference between Dr. Kilpatrick's before- and after-value findings as the just compensation owed to these eight plaintiffs.[9] The allocation of compensation (before interest) is as follows:

| | Before Value | After Value | Just Compensation |
|---|---|---|---|
| Burger Family Property | $1,357,000 | $319,958 | $1,037,042 |
| Hayes Family Property | $65,000 | $23,213 | $41,787 |
| LaRose Properties | $270,000 | $119,888 | $150,112 |
| Chaney-Frye 4 | $630,000 | $249,500 | $380,500 |
| Lane Family Property | $1,154,000 | $605,984 | $584,016 |
| Historic Wafco Condo. Ass'n | $3,377,000 | $76,000 | $3,301,000 |
| Michelle Agapion Morgan | $275,000 | $90,000 | $185,000 |
| Chapman/Spring Garden | $780,000 | $65,000 | $715,000 |
| Total | | | $6,394,457 |

---

[9]      Defendant's failure to provide alternative fair-market-value calculations underscores the Court's findings.

### 2.      The Appropriate Interest Rate

As a component of just compensation, plaintiffs are entitled to interest payments to account for the delay between the time of the taking and payment for the taking.  *See Kirby Forest Indus., Inc. v. United States,* 467 U.S. 1, 10 (1984).  Consistent with the reasoning supporting the consensus of interest-rate determinations for rails-to-trails cases by this Court, the Court finds plaintiffs are entitled to the Moody's Aaa Corporate Bond rate with annual compounding interest.  *Hardy*, 138 Fed. Cl. at 356.

## IV.    Conclusion

The Court finds that plaintiffs met their burden of proving their claims for just compensation.  Additionally, the Court **GRANTS** plaintiffs' Motion for Partial Summary Judgment as to the Appropriate Interest Rate.  Accordingly, the Court awards compensation in the amount of **$6,394,457.00** with interest calculated using the Moody's rate, compounded annually, and directs the clerk to enter judgment for these eight plaintiffs under RCFC Rule 54(b) consistent with this opinion.


**IT IS SO ORDERED.**

s/ *Loren A. Smith*

Loren A. Smith
Senior Judge